UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ) <br> MICHAEL ROBINSON, ) <br>                 Petitioner, ) <br> ) <br> v. ) <br> ) <br> MICHAEL P. ATCHISON, Warden, ) <br> ) <br>                 Respondent. ) | Case No. 08 C 4027 <br><br> Judge Joan B. Gottschall |

## **MEMORANDUM OPINION & ORDER**

Petitioner Michael Robinson was convicted of the first-degree murder of his co-worker, Geoffrey DuPont, and was sentenced to thirty-eight years of imprisonment. He now challenges that conviction pursuant to 28 U.S.C. § 2254.[1] For the reasons set forth below, the court denies the petition.

### **I. Background**[2]

Robinson had worked for a Meineke car repair shop in Wauconda for nearly three years when DuPont was hired in March 2002. According to Robinson (who testified in his own defense at trial), while DuPont worked at Meineke, he sold cocaine to Robinson. Robinson purportedly paid DuPont $300 to $400 for cocaine deliveries in $50

---

[1] Donald Hulick was the respondent originally named in Robinson's petition, as he was the warden of Menard Correctional Center at the time Robinson's petition was filed. Because Hulick was sued in his official capacity, the court substitutes the current warden as the proper party respondent pursuant to Rule 2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254 and Fed. R. Civ. P. 25(d)(1).

[2] The court takes its facts from the Illinois Appellate Court's recitation in *People v. Robinson*, No. 2--02--1171 (Ill. App. Ct. Nov. 24, 2004) and *People v. Robinson*, 872 N.E.2d 1061 (Ill. App. Ct. 2007). *See Morgan v. Hardy*, 662 F.3d 790, 797-98 (7th Cir. 2011) ("We presume state factual findings to be correct, unless the petitioner rebuts the presumption by clear and convincing evidence. The presumption of correctness also applies to factual findings made by a state court of review based on the trial record.") (citations omitted).

increments; he claimed that DuPont always gave Robinson more cocaine than Robinson had paid for because DuPont liked him. Both men allegedly used drugs while on the job.

On the morning of April 12, 2002, Robinson arrived an hour late for work. On both this occasion and a similar occasion a week earlier, DuPont told the manager that Robinson was late. Nonetheless, Robinson claimed that there was no animosity between the two until the end of the workday, when Robinson allegedly told DuPont that he was no longer going to use drugs, and therefore would no longer spend time with DuPont. According to Robinson, DuPont told him that if he was no longer going to buy cocaine, he would have to pay for the extra cocaine he had received. When Robinson replied that he did not have the money, he claimed that DuPont (1) threatened to shoot Robinson, (2) told Robinson he would kill him, and (3) told Robinson that if he were arrested because of Robinson, he would have someone else shoot Robinson. Robinson admitted that DuPont never displayed a gun and he knew DuPont's gun was not at the Meineke, but he also claimed that he had had previous discussions with DuPont concerning DuPont's gun ownership.

Robinson claimed that at that point, he feared for his life. He reached down, grabbed a sledge hammer, and swung it at DuPont, hitting him on the left side of his head. DuPont sat down in a chair and remained there without speaking. When DuPont began to lift his arms, Robinson swung again, but Robinson had closed his eyes and could not be certain as to whether he made contact. Robinson hit DuPont a third time, then went to rinse the blood off the hammer. When he returned, he saw that DuPont was bleeding all over the floor, so he got a plastic bag to stop the bleeding. Robinson did not think DuPont seemed dead, so he crumpled up the plastic bag and shoved it deep down

into DuPont's throat. He testified that he tried to hide the bag because he was afraid that his fingerprints would give him away. Robinson also "wanted to hide [DuPont's] face," so he wrapped DuPont's head tightly with duct tape. Robinson retrieved a garbage barrel from the parking lot and placed DuPont's body inside, later covering the body with trash.

As Robinson was cleaning up the blood, he noticed DuPont's wife, Julie, approaching the Meineke shop. He realized that he had no way to hide the barrel, so he rolled something in front of it and pretended to sweep. He informed Julie that DuPont had left work earlier with a friend. Robinson then entered DuPont's "leave time" as 4:00 p.m. in order to coincide with the information he had given to Julie.

After closing the shop, Robinson loaded the barrel into his pickup truck and drove to a local bar to pick up his roommate's girlfriend, Wendy. At the bar, Robinson spoke with some people and then gave Wendy a ride home. Robinson claimed that he felt he had to tell someone what he had done. He drove to the home of Steve Caldararo, the Meineke manager, and told him what had happened. Caldararo called a police officer friend to ask for advice. The officer recommended that Robinson turn himself in. Robinson agreed, and Caldararo telephoned the police.

When the officers arrived at the scene, Robinson directed them to the barrel in the bed of his truck. After digging past the barrel's layer of trash, the officers uncovered shop towels covered in blood and brain matter, a shirt, a bloody latex glove, overalls, a baseball cap, and pieces of broken sunglasses. At the bottom of the barrel, officers found DuPont's body. DuPont's head had several depressed skull fractures with protruding brain matter. The paramedics pronounced DuPont dead at the scene. Officers searching the rest of the truck's bed found a plastic bag with the words "deep throt" [sic]

handwritten on the front. Robinson testified that he wrote that message "so somebody would know it was in there."

The officers also recovered a work shirt covered with blood. The name tag on the shirt had been torn off, but the tag was later found in a tool drawer inside the Meineke. At the shop, investigators located the sledge hammer and skull fragments. They found blood residue on a chair, a workbench, a toolbox, a tool cart, and the floor of the service bay area; they did not find any blood on the main shop floor, which had been recently cleaned. Before Robinson was taken to the police station, he spontaneously told one of the officers that he had tried to clean up but may not have removed all of the blood. On the ride to the station, Robinson also volunteered that he did not mean to kill DuPont.

A grand jury indicted Robinson on two counts of first degree murder. During the trial, the judge required Robinson to wear leg restraints. When Robinson appeared in court in the restraints prior to jury selection, his attorney asked that they be removed, expressing concern that a juror might see. The trial court refused, although it stated that if counsel thought that someone would see the shackles they could move the trial to a different courtroom. The court also said that if Robinson chose to testify, the shackles would be removed.

During a recess, a juror walked into the courtroom while Robinson was being permitted to stretch. The juror was quickly ushered out, and a security officer attempted to block her view. Defense counsel brought the incident to the trial court's attention, stating that he had no way to know whether the juror had actually seen Robinson in shackles. The trial judge acknowledged the information, but no inquiry was conducted and no further action was taken.

At trial, a number of witnesses for the prosecution testified, including the forensic pathologist who performed DuPont's autopsy. The pathologist found that DuPont had suffered three blunt trauma injuries to the head. Those injuries were consistent with the sledge hammer recovered from Meineke. One of the injuries was in the back of DuPont's head, and the pathologist testified that if DuPont had been sitting up or standing straight, the injury could not have been inflicted by someone facing DuPont. He further noted that there were no defensive wounds on DuPont's hands. The pathologist found that the duct tape around DuPont's head was wrapped so tightly that it prevented any air from entering or exiting DuPont's nose or mouth. The pathologist also located the plastic bag that Robinson had stuffed down DuPont's throat, noting that the bag—which measured 11 x 17 inches—was lodged so deeply that it was not visible by examining the mouth. The pathologist concluded that DuPont died from multiple blunt traumas to the head, although he further opined that the airway obstruction from the bag and the duct tape would have been sufficient, by itself, to eventually cause death.

After the State rested its case, Robinson chose to testify in his own defense. At that time, defense counsel asked the trial judge whether Robinson would be permitted to walk back to the table (*i.e.*, without leg restraints) when he finished testifying. The trial judge said that the jurors would be excused before Robinson could approach or leave the witness stand, indicating that his legs would remain restrained. Counsel objected, and the court acknowledged the objection, but did have Robinson testify in this manner.

Robinson presented his testimony in an attempt to convince the jury that he acted in self-defense; he also presented an alternate theory of second degree murder based on the unreasonable belief in the need for self-defense. The jury rejected those theories and

found Robinson guilty of first degree murder. The court ultimately sentenced him to 38 years of imprisonment.

After trial, Robinson filed a post-trial motion arguing, *inter alia*, that the prosecutor, Michael Mermel, made a number of improper and inflammatory statements during his closing argument. The trial court denied this motion, and Robinson—represented by counsel—filed a timely notice of appeal. In an unpublished Rule 23 order, the Illinois Appellate Court affirmed the trial court's decision. *See People v. Robinson*, No. 2--02--1171 (Ill. App. Ct. Nov. 24, 2004). Robinson filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court, which was denied on March 30, 2005.

On September 22, 2005, Robinson filed a *pro se* post-conviction petition in the Circuit Court of Lake County. In this petition, he advanced a new line of argument, claiming that (1) his trial counsel was ineffective because counsel failed to adequately object or insist on a hearing regarding the use of restraints on his legs during the trial, and (2) his appellate counsel was ineffective for failing to argue that the trial court erred by shackling him during trial. The trial court dismissed the petition, finding that the claim was entirely without merit.

On appeal, Robinson was represented by the state appellate defender. Again, the appellate court affirmed the trial court's decision. The appellate court noted that nothing in the record indicated why the trial judge decided that Robinson needed to be shackled,[3] and that the judge likely erred by failing to place his reasons on the record. Ultimately,

---

[3] In addition to the leg shackles, the record also indicates that Robinson was wearing some type of "body belt." As the appellate court noted, there is no description of that belt in the record. The court hypothesized that it might have been an electronic stun belt, and assumed that it was some type of restraint; the court also thought it a "fair assumption" that "the reason that the record does not disclose the nature of this device is that defendant's counsel never sought a hearing at which such information could be obtained." *Robinson*, 872 N.E.2d at 1071 n.1.

however, the court found that there was no evidence that any juror saw Robinson's shackles or that the shackles impaired Robinson's ability to participate in his own defense. *Id.* at 1074. Moreover, in light of the "overwhelming" evidence against Robinson's claim of self-defense, the court held that the shackling was harmless error and Robinson's petition did not sufficiently allege the prejudice needed for a successful claim of ineffective assistance of counsel. *Id.* at 1071, 1075-77.

For these reasons, the appellate court affirmed the dismissal of the petition, and Robinson filed a PLA. That PLA was denied on November 29, 2007. Robinson has now filed his petition for a writ of habeas corpus in this court. He sets out four grounds for relief: (1) the trial judge's error in keeping him shackled at trial, (2) trial counsel's failure to object to the restraints or to raise the issue via post-trial motion, (3) the prosecutor's misconduct in closing and rebuttal arguments at trial, and (4) his appellate counsel's failure to raise "all meritorious claims of error on appeal."

## II. LEGAL STANDARD

As the Supreme Court has repeatedly emphasized, "a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) (quoting *Wilson v. Corcoran*, 131 S.Ct. 13, 15 (2010)); *see Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), further narrows a reviewing court's inquiry. Under the AEDPA, a federal court can only grant relief where the challenged state court decision is "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court of the United States.

*See Greene v. Fisher*, 132 S.Ct. 38, 42 (2011). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision involves an "unreasonable application" of clearly established federal law where the court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 65 (2003).

Before a federal court may evaluate the merits of a habeas corpus petition, the petitioner must have exhausted his remedies before the state court. *See Harrington v. Richter*, 131 S.Ct. 770, 787 (2011) (citing 28 U.S.C. § 2254(b)). This means that a defendant "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (describing Illinois' appellate procedures).

In addition, "'[a] habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim.'" *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008) (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004)). Federal review also is precluded when the state court's decision rests on an adequate and independent state law ground, *see Promotor v. Pollard*, 628 F.3d 878, 885 (7th Cir. 2010), because where an

8

independent state ground supports the judgment, a ruling on the federal claims would be advisory. *See Harrington*, 131 S.Ct. at 787; *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009) ("[W]hen a state refuses to adjudicate a petitioner's federal claims because they were not raised in accord with the state's procedural rules, that will normally qualify as an independent and adequate state ground for denying federal review.") (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Procedurally defaulted claims will be evaluated, however, "if the petitioner can establish cause and prejudice for the default, or establish that the failure to consider the defaulted claim will result in a fundamental miscarriage of justice." *Promotor*, 628 F.3d at 885 (citing *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010)).

### III. ANALYSIS

**A. Robinson's Shackles**

1. <u>Procedural Default</u>

Respondent concedes that Robinson has exhausted his state remedies, because Robinson can no longer avail himself of any state-court review on the issues he raises in his petition. However, Respondent argues that Robinson's first claim—that the trial judge denied him due process[4] by placing him in restraints without holding a hearing—is procedurally defaulted, because Robinson never raised this as a stand-alone argument. Respondent also argues that Robinson failed to raise the issue in his PLA, which created a "further layer of default." In support, Respondent cites *Lewis v. Sternes*, 390 F.3d 1019 (7th Cir. 2004), where the Seventh Circuit found two claims (a tainted identification and

---

[4] In fact, Robinson claims he was denied due process, equal protection, and effective assistance of counsel, and his petition purports to raise each of his four claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments. To the extent that Robinson attempts to raise an equal protection claim, a cruel and unusual punishment claim, or other claims that he had not raised before the state court (*i.e.*, other undefined "meritorious claims of error" that were not raised by appellate counsel), those claims are procedurally barred because they have not been presented at any stage to the state courts.

9

a *Batson* violation) were procedurally defaulted when the petitioner did not directly pursue the issues on appeal, but instead cited counsel's failure to pursue those claims in support of his claim to ineffective assistance of counsel. *See Lewis*, 390 F.3d at 1026 ("[T]he fact that the ineffectiveness claim was raised at some point in state court does not mean that the state court was given the opportunity to address the underlying issue that the attorney in question neglected to raise.").

Courts in this circuit do not always take a hard line on this issue, particularly where a petitioner is proceeding *pro se*. *See, e.g.*, *McGee v. Bartow*, 593 F.3d 556, 567 & n.9 (7th Cir. 2010) ("[W]e have recognized that in some circumstances, where ineffective assistance claims are presented 'as a means to reach' the embedded claims and those claims are the real substance of a petitioner's challenge, we will consider them fairly presented."); *Malone v. Walls*, 538 F.3d 744, 753-55 (7th Cir. 2008); *U.S. ex rel. McCray v. Gaetz*, No. 10 C 463, 2010 WL 3547983, at *5 (N.D. Ill. Sept. 7, 2010) (describing *Malone* as holding that a *pro se* petitioner does not procedurally default on the embedded claim when the petitioner made it clear that he sought review of that claim). In determining whether a claim was "fairly presented" to the state court, this court evaluates whether "the operative facts and the controlling legal principles of the federal claim [were] submitted to the state court through one complete round of state-court review." *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009) (citing *Malone*, 538 F.3d at 753). In other words, "[a] 'hypertechnical congruence' of the claims is not required between federal and state court for a claim to be fairly presented; instead [the federal court looks to] whether the petitioner alerted the state court to the federal nature of his claim in a

manner sufficient to allow that court to address the issue on a federal basis." *Crockett v. Hulick*, 542 F.3d 1183, 1192-93 (7th Cir. 2008) (citations and quotation marks omitted).

Here, a review of Robinson's original post-conviction petition (when he was acting *pro se*) establishes that he fairly presented the issue to the state trial court. Although the headings of Robinson's petition do not include allegations directed toward the judge's decision to restrain him, in the body of his petition he specifically noted that "there is nothing in the record that would suggest petitioner was a threat to the court, juror's [sic], himself or otherwise a high escape risk," and "[t]he trial judge must state for the record his reason for allowing the defendant to remain shackled and must give the defendant's attorney an opportunity to present reasons why the defendant should not be shackled." (*See* Pet. for Post-Conviction Relief at Ex. G, ECF 13-2.) That was enough to raise the claim to the trial court.

In his appeal, Robinson was represented by counsel, who again did not separately highlight the issue of the trial judge's failure to hold a hearing on the restraints. But even assuming *arguendo* that this would otherwise result in default, the state appellate court actually addressed the issue on the merits. (*See* Resp't Answer at 16 (admitting that the state appellate court reviewed the claim on its merits).) As a result, there is no procedural default at the state appellate level. *See Pole v. Randolph*, 570 F.3d 922, 936-37 (7th Cir. 2009) (finding no procedural default where the state appellate court agreed that a petitioner had not adequately raised two claims, but nonetheless went on to address the claims on the merits); *Morales v. McCann*, No. 00 C 2656, 2010 WL 748203, at *29 (N.D. Ill. Feb. 25, 2010) ("If the last state court to consider a constitutional claim

addresses it on the merits, procedural default poses no barrier to a federal court's consideration of the claim.").

That leaves the PLA as a potential default point. By that time, Robinson was acting *pro se* once again, although he incorporated a significant portion of the arguments raised in the appellate briefing. Critically, he also included the lines quoted above from his original post-conviction petition. This was more than enough to fairly present the issue in the PLA. The claim was not procedurally defaulted.

2. <u>Harmless Error</u>

While this claim is not procedurally defaulted, it cannot succeed on the merits. The Illinois Appellate Court declined to grant Robinson relief despite the trial judge's failure to provide an adequate justification for Robinson's shackling, because (1) it was not clear that the jury actually saw Robinson's shackles, and (2) in any event, the State proved beyond a reasonable doubt that the verdict was not obtained due to shackling, making the judge's (and counsel's) error harmless. *Robinson*, 872 N.E.2d at 1073. Because the state court conducted a harmless-error analysis as set out in *Chapman v. California*, 386 U.S. 18, 24 (1967), this court must determine whether the state court's application of *Chapman* was reasonable. *See Brown v. Rednour*, 637 F.3d 761, 766 (7th Cir. 2011); *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009) ("If the state court has conducted a harmless-error analysis, the federal court must decide whether that analysis was a reasonable application of the *Chapman* standard. If the answer is yes, then the federal case is over and no collateral relief issues. . . . If the answer is no—either because the state court never conducted a harmless-error analysis, or because it applied *Chapman* unreasonably—then § 2254(d) drops out of the picture and the federal court must make

an independent decision [under *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993)], just as if the state court had never addressed the subject at all.").[5]

Here, the state appellate court began by recognizing the controlling law set out by the Supreme Court: "The visible shackling of a defendant during the guilt phase of his trial violates due process unless the prosecution can show that the shackling is justified in the particular case by an essential state interest." *Robinson*, 872 N.E.2d at 1071 (citing *Deck v. Missouri*, 544 U.S. 622, 624 (2005)). The court also noted "where a court orders a defendant to wear shackles that will be seen by the jury without adequate justification," the defendant does not need to demonstrate actual prejudice; instead, the burden shifts to the State, which must prove beyond a reasonable doubt that the shackling did not contribute to the verdict. *Id.* (citing *Deck*, 544 U.S. at 635). Even though the record contained evidence that might have justified the trial judge's decision to keep Robinson restrained (such as a past incident where Robinson arguably absconded from probation), the appellate court concluded that it could not infer such a justification: "A proper hearing, with an opportunity for defendant's trial counsel to produce contrary evidence, followed by a statement of reasons, would still have been required." *Id.* at 1072. Thus, "[t]he record strongly suggests, if it does not conclusively demonstrate, that the trial court

---

[5] Many circuits have concluded that *Fry v. Pliler*, 551 U.S. 112 (2007), eliminates the need to conduct the *Chapman* inquiry and instead requires the reviewing federal court to analyze constitutional error under *Brecht* (*i.e.*, to determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict"). *See, e.g.*, *Wood v. Ercole*, 644 F.3d 83, 93-94 & n.9 (2d Cir. 2011) ("[W]e conclude that the 'unreasonable application of *Chapman*' standard does not survive *Fry*."); *Bauberger v. Haynes*, 632 F.3d 100, 104 (4th Cir. 2011) ("Federal habeas courts must always review constitutional errors in state trials under *Brecht*, but they need not debate whether a state court's harmless error determination also unreasonably applied *Chapman*."). This may be a distinction without much difference, as the Seventh Circuit seems to agree that "any error sufficiently harmful to satisfy the *Brecht* 'actual prejudice' standard could be deemed harmless beyond a reasonable doubt only by unreasonably applying *Chapman*." *Jones v. Basinger*, 635 F.3d 1030, 1052 n.8 (7th Cir. 2011).

erred in shackling defendant without holding a hearing or providing reasons on the record."

The appellate court recognized the constitutional error, and discussed in detail the potential issues arising therefrom. First, the shackles could have had some effect on the jury's perception of Robinson's guilt. In this case, however, the trial judge took steps to ensure that the jurors would not see Robinson's shackles—which apparently were not very obtrusive, as the judge described the restraints as "not exactly shackles, but some wire or something"—by making sure that Robinson's legs were "tucked in." The judge also took care to move Robinson only at times where the jurors would not see the restraints. The only indication that a juror saw the shackles is the incident when a single juror briefly walked into the courtroom while Robinson was stretching, but the issue was left unexplored, and there is nothing to indicate that juror actually saw the restraints. Second, the shackles could have restricted Robinson's ability to interact with counsel and to assist in his own defense. However, as the appellate court noted, there is simply no evidence in the record to support this theory. Robinson's "ability to view and hear the proceedings, or to talk to his attorneys, was unaffected." Both of these conclusions are fully supported by the record, and indicate that the shackling was harmless error. *See also United States v. Cooper*, 591 F.3d 582, 588-89 (7th Cir. 2010) (finding no plain error when trial judge required a defendant to wear shackles without justification because "[c]ritically, these were not *visible* shackles," and because the shackling did not impede the defendant's access to counsel).

But the real crux of the appellate court's decision was its conclusion that the evidence of Robinson's guilt was "overwhelming." *Robinson*, 872 N.E.2d at 1074.

14

Indeed, the court believed that any other result "would have bordered on jury nullification," because *even if* the jury accepted Robinson's account of DuPont's killing, controlling law "all but compelled" a verdict of first-degree murder. *Id*. Not only is this a reasonable conclusion, but this court agrees.

First, DuPont's lack of defensive wounds, combined with Robinson's actions—such as hitting DuPont on the side or back of the head, hitting DuPont multiple times even after he had collapsed into a chair, carefully cleaning up the area and hiding the body, and speaking with people at a bar immediately after the murder—belie his claim to have acted spontaneously out of fear for his life. But as the appellate court pointed out, even accepting that Robinson subjectively believed his life was in danger, the jury was still "all but forced to reject his claim" of self-defense. No evidence suggested that Robinson was in danger of "imminent" bodily harm, as required for the justifiable use of force under Illinois law. *See* 720 Ill. Comp. Stat. 5/7-1 (use of deadly force justified only where person "reasonably believes that such force is necessary to prevent *imminent* death or great bodily harm to himself or another, or the commission of a forcible felony"). Robinson acknowledged that he never saw a gun and that he believed DuPont's weapon was not at the Meineke shop; in fact, DuPont's wife testified that DuPont did not even own a gun. As the appellate court aptly stated:

> The only evidence that defendant feared that DuPont might shoot him then and there was his testimony that he did not wait to see whether DuPont would pull a gun because, if DuPont had one, defendant would "pretty much lose." However, even this testimony implies that defendant faced neither a probable threat nor a present one. Indeed, it is an admission that defendant launched a deadly preemptive strike against DuPont because he suspected, without any objective basis, that DuPont might be carrying a gun. As a matter of law, that was insufficient even to raise a valid argument that defendant faced a danger that justified the use of deadly

force. Thus, the evidence that defendant was guilty of at least second-degree murder was overwhelming.

*Robinson*, 872 N.E.2d at 1076.

Similarly, the appellate court concluded that Robinson's alternative theory of second-degree murder could not have persuaded the jury, in large part because Robinson had the burden of proving by a preponderance of the evidence that he subjectively believed his use of deadly force was justified. See 720 Ill. Comp. Stat. 5/9–2(a)(2). Not only did the jury have ample evidence from which to conclude that Robinson did not fear DuPont, but as set out above, Robinson's own testimony did not establish that the use of deadly force was justified. In light of the foregoing, the appellate court concluded that the State met its burden of proving that the shackling error did not contribute to the verdict. That conclusion was eminently reasonable.

Because the trial court's error was harmless, it logically follows that counsel's error in failing to insist[6] on a hearing could not have prejudiced Robinson. *See Stephenson v. Wilson*, 619 F.3d 664, 671 (7th Cir. 2010) (when challenging a restraint on direct appeal, the burden is on the State to prove beyond a reasonable doubt that the restraint did not influence the verdict, but where a petitioner instead challenges counsel's effectiveness, the petitioner must show that he was prejudiced by counsel's error). Likewise, "[b]ecause the shackling was harmless error, appellate counsel's decision not to raise the issue was neither objectively unreasonable nor prejudicial." *Robinson*, 872 N.E.2d at 1077. The appellate court reasonably applied the *Chapman* standard in

---

[6] The appellate court recognized that defense counsel "was far from totally passive on the issue," but that counsel's concern was largely limited to the visibility of the shackles, not whether the shackling itself was permissible.

16

concluding that any error arising from the judge's decision to shackle Robinson during the guilt phase of his trial was harmless.

**B. The Prosecutor's Misconduct**

The other issue that Robinson raises in his petition to this court is that of the prosecutor's alleged misconduct during closing and rebuttal arguments. As a preliminary matter, Robinson argues to this court that the prosecutor engaged in a variety of misconduct, including (1) attempting to inflame and arouse the passions of the jurors, (2) arguing his personal opinion, (3) misstating evidence or describing facts that were not in evidence, (4) vouching for the credibility of state witnesses, and (5) shifting the burden of proof onto the defendant. There is some basis for these arguments in the post-trial motion that was presented to the state trial court. At that time, for instance, counsel highlighted the fact that the prosecutor may have cried in front of the jury and improperly suggested that Robinson had the burden of proving his innocence. (*See* R. 838-39, Ex. N, ECF No. 13-11.) But on appeal, many of these arguments fell by the wayside. The portion of the closing argument presented for discussion to the appellate court was fairly limited:

| | |
|---|---|
| *Prosecutor*: | Ladies and gentlemen, the defendant hasn't even come close to proving by a preponderance of the evidence.[7] He hasn't come close to proving anything based on that r[i]diculous testimony. But for anybody to buy that story and find him guilty of second degree murder would be an injustice. I would contend a travesty of justice. |
| *Defense Counsel*: | Objection. |
| *Trial Court*: | Overruled. |

---

[7] The court notes that no burden-shifting occurred here, because the prosecutor was discussing the viability of Robinson's second-degree murder defense. Under Illinois law, Robinson had the burden of proving by a preponderance of the evidence that he subjectively believed his use of deadly force was justified. See 720 Ill. Comp. Stat. 5/9–2(a)(2).

* * * *

*Prosecutor*: You all took an oath as jurors when you were seated in this case. If the evidence shows beyond a reasonable doubt that he committed an unprovoked, unjustified first degree murder and if you compromise your verdict when the true evidence has shown him guilty of first degree murder, you have violated your oaths.

*Defense Counsel*: Objection.

*Trial Court*: Objection is sustained as to the last sentence. Mr. Mermel's last sentence will be disregarded by the jury. You have 15 seconds.

*Prosecutor*: If your evidence proves him guilty of first degree murder and you find him guilty of only second degree murder out of pity, then your sympathy is bought with the blood of Geoffrey DuPont.

*Defense Counsel*: Objection.

*Trial Court*: Objection is sustained. Jury will disregard the statement.

(R. 787-90, Ex. N, ECF No. 13-11.) As a result of this limited submission to the appellate court, any arguments that were not fairly presented are procedurally defaulted.

In evaluating the prosecutor's statements, this court unequivocally agrees with the appraisal provided by Robinson's appellate counsel:

> [D]uring a trial involving [ ] a defendant accused of perhaps the most serious offense in our criminal code; a conscientious judge who, although perhaps not perfect, tried very scrupulously to be fair to both sides[; and] lawyers on both sides who were obviously experienced and dedicated to their respective roles[,] a single prosecutor gratuitously and unnecessarily injected fundamental error into the process.

(*See* Pet'r Br. at 22, Ex. A, ECF No. 13.) But this court's role here is not to determine whether it would grant a new trial based on this misconduct in the first instance. Instead, this court must determine whether the state appellate court's decision was a reasonable application of clearly established federal law. *See Brown*, 637 F.3d at 766. Because this court concludes that the appellate court's decision was eminently reasonable, this court

declines to grant Robinson's petition.  First, with respect to the "travesty of justice" comment, the appellate court found that the prosecutor's remark did not rise to the "same grave level" as statements telling the jury it would violate its oath by acquitting Robinson.  The court reasoned that the prosecutor was "strongly arguing against a finding of second degree murder and in favor of a first degree murder conviction, all based on the evidence before the court," and that the argument was clearly in response to defense counsel's argument advocating a verdict of second-degree murder.  The court concluded that the jury was not influenced to abandon its duty to be fair and unbiased and that there was no error in the remarks.  Regardless of whether this court would make the same decision in the first instance, it cannot say that this is determination was unreasonable.

And with regard to the last two statements, the appellate court held that defense counsel immediately objected to the prosecutor's statements and the trial court sustained the objection, which cured any prejudice the remarks had caused.  The appellate court's finding was reasonable.  *See United States v. Curry*, 538 F.3d 718, 728 (7th Cir. 2008) ("This court repeatedly has held that jurors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds.") (internal quotation marks and citation omitted); *United States v. Nunez*, 532 F.3d 645, 654 (7th Cir. 2008) ("Improper statements made during closing argument are rarely reversible error.") (citations omitted).  Because the state appellate court's opinion is neither "contrary to" nor "an unreasonable application" of clearly established federal law, this court must deny Robinson his requested relief.  28 U.S.C. § 2254(d)(1).

## IV. CONCLUSION

For the reasons set forth above, Robinson's petition for a writ of habeas corpus is denied in its entirety.

ENTER:

　　　　/s/　　　　　　　
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 27, 2012